**GENOVA BURNS LLC**
110 Allen Road, Suite 304
Basking Ridge, New Jersey 07920
Phone: (973) 467-2700
**DANIEL M. STOLZ, ESQ.**
**LAUREN W. GERSHUNY, ESQ.**
**JACLYNN N. McDONNELL, ESQ.**
DStolz@genovaburns.com
LGershuny@genovaburns.com
Jmcdonnell@genovaburns.com
*Counsel for Plaintiffs*

**MICHAEL M. COHEN, ESQ.**
275 Walton Street
Englewood, New Jersey 07631
Phone: (201) 370-4826
MCohen@yourlitigationteam.com
*Special Litigation Counsel*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NAYA STONE, LLC,<br><br>           Debtors-in-Possession. | Case No.: 24-20223 VFP<br><br>Chapter: 11<br><br>Judge: Vincent F. Papalia |
| NAYA STONE, LLC,<br>           Plaintiffs,<br><br>        v.<br><br>AMIHAI DABAH, ELANIT DABAH, JAC ELAN LLC, JAC ELAN PROJECTS LLC, MOSAIC EXPRESSIONS PLUS LLC, M PLUS HOLDING LLC, 406 MARC DRIVE LLC, LA SOVA operating under JOHN DOE CORPORATION, EMET HOLDINGS LLC, ARENA STONE RE LLC, AMNON DABAH, YONATAN SULIMAN-ZADA, and ITHAMAR AHARANOV,<br><br>           Defendants. | Adv. Pro. No. 25- |

**<u>ADVERSARY COMPLAINT</u>**

1

1.      NAYA Stone, LLC ("NAYA") by and through his attorneys, Genova Burns, LLC and Michael Cohen Esq., as and for its Adversary Complaint against Defendants Amihai Dabah ("Dabah" or "Ami"), Jac Elan LLC ("Jac Elan"), Jac Elan Projects LLC, EMET HOLDINGS LLC, 406 Marc Drive LLC, Elanit Dabah, Ithamar Aharanov, Amnon Dabah, Yonathan Suliman-Zada and say as follows:

## THE PARTIES

2.      NAYA is a New Jersey limited liability company with its principal place of business at 690 Washington Ave., Carlstadt, New Jersey 07072. Avraham Dahan ("Dahan") through an entity named AVRD Corp. is the current sole owner of NAYA.  For the purposes of this Complaint, "NAYA" refers to either NAYA Stone, LLC or its subsidiary Arena Stone, Inc. which it acquired in 2019.

3.      Amihai Dabah, at all times relevant to this action, was the self-appointed and unilaterally assumed managing member of NAYA and from the inception of NAYA until September 13, 2024, and prior to September 13, 2024, was a member of NAYA with a 1/3 membership interest.  After September 13, 2024, Dabah had zero membership interest in NAYA. Dabah resides at 1464 Lafite Court, Toms River New Jersey and at 1484 E.15th Street Brooklyn New York 11230.

4.      Defendant Elanit Dabah is the wife of Dabah.  Elanit Dabah is the Managing Director of Jac Elan.  Elanit Dabah resides at 1464 Lafite Court, Toms River New Jersey and at 1484 E.15th Street Brooklyn, New York 11230.

5.      Defendant Jac Elan LLC ("Jac Elan") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 30 W 22nd Street, New York, New York, 10010.

6.     Defendant Jac Elan Projects LLC ("Jac Elan Projects") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 30 W 22nd Street, New York, New York, 10010.

7.     Defendant Amnon Dabah is Amihai's brother and straw man and together with their 3rd partner Yonatan Suliman-Zada they operate the La Sova restaurant.  Amnon Dabah resides at 2122 E. 66th Street Brooklyn New York 11234.

8.     Defendant Yonatan Suliman-Zada is Amnon Dabah's partner and additional straw man in La Sova Restaurant.  Yonatan Suliman-Zada resides at 1414 E. 15th Street Brooklyn New York 11230.

9.     Defendant Ithamar Aharanov ("Aharanov") is a straw man/partner for Dabah who bought 406 Marc Drive in Toms River New Jersey with NAYA funds.  Ithamar Aharanov resides at 402 Marc Drive, Toms River New Jersey.

10.     MOSAIC EXPRESSIONS PLUS LLC is a limited liability company organized by Dabah with its principal place of business at 30 W 22nd Street, New York, New York, 10010 and/or from time to time at 1484 E.15th Street Brooklyn New York 11230.

11.     M PLUS HOLDING LLC is a limited liability company organized by Dabah as the parent entity that owns Jac Elan LLC with its principal place of business at 30 W 22nd Street, New York, New York, 10010 and/or from time to time at 1484 E.15th Street Brooklyn New York 11230.

12.     406 MARC DRIVE LLC is a limited liability company organized by Dabah with its principal place of business at 1358 Hooper Ave., Toms River, New Jersey and/or from time to time at 1484 E.15th Street Brooklyn New York 11230.  Based on the LLC's Certificate of Amendment, filed February 29, 2024, Dabah is the Managing Member.

3

13.     EMET HOLDINGS LLC is a limited liability company organized by Dabah with its principal place of business at 1358 Hooper Ave., Toms River, New Jersey.  Based on the LLC's Certificate of Formation, Dabah and straw man Ithamar Aharanov are the Managing Members.

14.     LA SOVA operating under JOHN DOE CORPORATION is an entity created by straw men Amnon Dabah and Yonatan Suliman-Zada as a pass-through to move money from NAYA through Jac Elan and other entities for the purposes of funding the La Sova restaurant, a New York business, organized by Dabah and associates for the purposes of operating a restaurant with its principal place of business at 1301 East 13th Street, Brooklyn, NY 11230 and with w web address of www.la-sova.com.

15.     Arena Stone RE LLC is a limited liability company organized by Dabah, the sole listed member with its registered principal place of business at 690 Washington Street, Carlstadt, New Jersey 07072.

## JURISDICTION AND VENUE

16.     Jurisdiction This court has jurisdiction of this adversary proceeding under 28 U.S.C. §§ 157(a)-(b), and 1334(b).

17.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because this proceeding arises under or is related to the above referenced bankruptcy case, currently pending in the United States Bankruptcy Court in the District of New Jersey.

## BASIS FOR RELIEF

18.     The statutory bases for the relief requested herein are sections 105(a), 362(a), 541 and 548 of the Bankruptcy Code and N.J.S.A. 25:2-25 et seq.

19.     The Plaintiffs commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(7), 7001(9) and 7065.

20.     The Plaintiffs have made no prior request for the relief requested herein to this or any other court

## STATEMENT OF FACTS COMMON TO ALL COUNTS

### Dahan & Dabah Form NAYA

21.     Dabah and Dahan knew each other from their community in Brooklyn, New York.

22.     At that time, in late 2017, Dahan was in finance and was invested in a number of businesses.

23.     Dabah owned a business in New York, Jac Elan, which was a retail storefront selling tile products only.

24.     Dabah and Dahan began discussing a joint venture in the stone business with the objective of purchasing a wholesale business in New Jersey.

25.     Much of the initial discussions were facilitated through Rabbi Moshe Aharonov,[1] a Rabbi that Dabah and Dahan both knew.  In fact, Rabbi Aharonov suggested that they work with a third member who resided in Israel, Yair Golan, who acted as an intermediary between Dabah and Dahan.  Yair Golan would own his 1/3 membership interest in NAYA together with Nir Golan (together, Yair and Golan are the "Golans").

26.      Dabah and Dahan agreed that they would form a new company named NAYA, with three equal members Dabah owning 1/3, Dahan owning 1/3 through AVRD Corp., and the Golans owning 1/3 through an entity they controlled called "World International Stone Inc.").[2]

---

[1]     NAYA believes that Dabah paid Rabbi Aharanov an undisclosed commission at the time for orchestrating the business connection.  Defendant Ithamar Aharonov is Rabbi Aharanov's son who may have been made a partner in Dabah's fraud by virtue of a silent agreement between the Aharanovs and Dabah.

[2]     NAYA is an acronym for Nir, Amihai, Yair and Avraham

27.    Initially, it was understood that Dabah would contribute Jac Elan as his initial capital contribution, and Dahan and the Golans would contribute an equal amount of cash as their initial capital contributions.

28.    On or about September 20, 2018, NAYA was formed by Dabah's counsel as a limited liability company under the laws of New Jersey.  Dabah never listed the other members on any corporate documents or prepared an operating agreement for NAYA.

29.    In October of 2018, Yair Golan contacted Dahan on behalf of Dabah, and told him that Dabah located an established stone business named Arena Stone Ltd. ("Arena Stone") in Carlstadt, New Jersey that was for sale.  Arena was owned by the same individuals that owned and/or controlled C&C Arc Stone Realty LLC ("C&C") the owner of the property from which Arena Stone operated its business.

30.    Arena Stone had previously been one of Jac Elan's largest suppliers and had been in business for about 40 years.  Dabah knew the owner of Arena Stone from their prior business dealings.  Dabah and Golan negotiated with Arena Stone and entered into a rough agreement.

31.    In late 2018, Dabah and Arena were in active negotiations, and the members of NAYA began discussing making the required capital contributions to start the business.

32.    On November 19, 2018, Dahan made his first capital contribution of $250,000 to NAYA.

33.    On November 26, 2018, Dahan made an additional capital contribution of $430,000 to NAYA.

34.    No other member made any capital contributions.[3]  Ever.

_____

[3]    The Golans asked Dahan to make a capital contribution on their behalf, treating it as a loan. However, the Golans never repaid that loan or made any capital contributions themselves. The matter was later resolved in an Israeli

35.    In December 2018, after Dahan made his capital contributions, Dabah demanded that he receive $1.25 million in exchange for NAYA acquiring Jac Elan.

36.    Specifically, Dabah demanded that he be paid $1.25 million for Jac Elan, which would be paid through the distribution of incoming profit (from both Jac Elan and Arena) to be distributed as follows:  the first 60% distributed evenly among the three members (20% to Dahan, 20% to Dabah, and 20% to the Golans) and the remaining 40% distributed to Dabah until he is fully paid his $1,250,000.

37.    Although Dabah repeatedly represented to the NAYA members that he had *already* completed the buyout of his partner in Jac Elan prior to the formation of NAYA, it was later revealed that this was not true, and that a portion of the funds provided by Dahan to NAYA were improperly misappropriated by Dabah to buy out his partner in Jac Elan.

38.    Subsequently, the parties agreed that the capital contribution of the Golans and Dahan would be increased to $1.28 million from $1.2 million. The extra funds were purportedly needed because of a miscalculation in the amount needed to buy additional inventory for NAYA at a European marble show that Dabah and Yair Golan were attending.

39.    In the first quarter of 2019, Dahan made his final capital contribution to NAYA of $230,000.

40.    In total, Dahan *at this point* funded $1,280,000.00 toward NAYA.

41.    Dabah retained the law firm of Herrick Feinstein LLP (the "Herrick Firm") to represent NAYA in its purchase from C&C and to review the closing documents prepared by them.

---

court, where it was agreed that, since the Golans had neither contributed funds nor repaid Dahan for his contributions, they would have no membership interest in NAYA. As a result, Dahan would hold a two-thirds (2/3) ownership interest

7

42.  The formal closing with C&C occurred on January 16, 2019.

43.  At the closing, Dabah signed the following agreements on behalf of NAYA (i) a Real Estate Purchase and Sale Agreement that gave NAYA the option to purchase the warehouse located at 690 Washington Avenue, Carlstadt, New Jersey (the "property") for $4M at any time before the Lease expired, (ii) an Asset Purchase Agreement (the "APA") for Arena Stone's business, (iii) a commercial lease on the property (iv) a Promissory Note for $1,500,000 on the APA; and (v) a Promissory Note for $59,012 for Arena Stone's inventory.

44.  Inexplicably, Although C&C had representation at the closing, Dabah made the unilateral, ill-fated, decision to appear at the closing without any representation even though the Herrick Firm represented NAYA.

45.  On the day of closing, NAYA, utilizing funds contributed by Dabah, paid C&C $500,000 as a deposit on the Option.

46.  In addition to the $500,000 deposit, NAYA, again using funds contributed by Dahan,  paid an additional deposit towards the APA of $334,000 to C&C that was comprised of two payments: (1) $200,000 in cash and (ii) a $134,000 payment directly to the State of New Jersey on behalf of C&C to pay a C&C tax bill.

47.  Dabah did not ever record NAYA's payment of the $334,000 deposit to C&C or receive any acknowledgement from C&C for the same.

48.  Dabah also failed to ensure that the rent payments were accounted as being credited toward the purchase price of the property as per the originally agreed amortization schedule.  This negligence ultimately resulted in NAYA being deprived of a benefit totaling $837,447.

**NAYA Begins Operating**

49.     C&C gave NAYA the keys to its business and full operational control on January 1, 2019, prior to the closing.

50.     Dabah, as a member of NAYA, began immediate operations.

51.     Even though Dahan funded 100% of NAYA, he was completely excluded from accessing any and all information relating to NAYA.

52.     Dahan had no access to business records or NAYA's bank accounts.

53.     Despite repeated demands, Dabah refused to give Dahan access to the records of the company and insisted that Dahan deal solely with Yair Golan.

54.     After several months of being locked out of the business, Dahan began to grow suspicious and demanded that Dabah be accountable.  Dabah's continued refusal to be financially transparent to the other members only fueled suspicion.

55.     In late 2020, Dahan confronted Dabah in a recorded conversation.  Part of that conversation is as follows:

> Dahan:   I want the financials right now.
> Dabah:   [Inaudible] you're not going to get it.
>
> Dahan:   I want them right now.
> Dabah:   You're not going to get it.
>
> Dahan:   Log in right now.
> Dabah:   You're not going to get it.
>
> Dahan:   Log in right now. What are you hiding?
> Dabah:   You're not going to get it.  I'm not hiding but that's what you don't understand.
>
> Dahan:   What are you hiding? Where you been stealing money for two years?

9

Dabah:    I am not hiding.

56.    Though Dahan could not verify it at the time, Dabah *was* purposely mismanaging NAYA in a way that allowed him to divert or otherwise take NAYA's profits and opportunities, for himself either directly, through Jac Elan or other entities.

57.    Dabah repeatedly represented to Dahan that NAYA had no profits and that NAYA was a sinking ship.  At the very same time, Dabah was methodically and surgically embezzling monies and opportunities belonging to NAYA and its members and creditors.

58.    At the same time, Dabah was taking an exorbitant salary that he later characterized as a "distribution" and appeared to be living a lavish lifestyle, far more extravagant than his lifestyle prior to being a member of NAYA.

59.    Dabah's representation that NAYA was not profitable stood at odds with the fact that, prior to acquiring Arena Stone, in 2018 the business was quite profitable with 8 months of sales data showing $3.6 million which extrapolated to $5.4 million in annual sales.  Based on market data in that industry, such sales should show an estimated $1.8M profit.  It appeared to Dahan that the only way to explain NAYA's insolvency was either that (i) Dabah was looting NAYA of its opportunities, funds, and relationships with creditors/vendors, or (ii) severely and negligently mismanaging the Company for Dabah's own personal benefit.

60.    On several occasions, Dahan told Dabah that if the company was experiencing financial issues, the members would need to discuss ways of fixing the business.  However, Dabah refused to provide any information to Dahan or discuss the business with him in any capacity.

61.    Dahan also repeatedly insisted that the parties agree on an Operating Agreement, however, Dabah refused.

62.    On numerous occasions, Dahan tried to visit the Arena Stone warehouse, however, Dabah stonewalled him and instructed all of NAYA's employees not to speak with him.  The last time that Dahan attempted to enter NAYA's business, Dabah called the police claiming that Dahan was trespassing.[4]

**The Option to Purchase the Property**

63.    After NAYA closed on the transaction with C&C, Dabah assumed sole control of NAYA and unilaterally, without consent of - or authority from - the other members, appointed himself the manager and controlling member

.

64.    On October 4, 2019, Dabah received correspondence from Anthony Colasanti on behalf of C&C, stating that "C&C was terminating the Option."

65.    Dabah did nothing to timely assert, or otherwise protect, NAYA's rights under the Option after receiving notice that C&C was terminating the Option

66.    Instead, Dabah continued paying the monthly payments to C&C as though nothing had occurred.

67.    As of January 5, 2022, after Dahan settled matters between himself and the Golans,[5] the membership structure of NAYA was that Dabah owned 1/3 and Dahan owned 2/3.

68.    In late February of 2022, Dabah received a Letter of Intent ("LOI") from an

---

[4]    Dahan ultimately obtained an Order from the Chancery Court that mandated that Dabah allow him full access to the Company including entry on the premises and access to all records.  Dabah did not comply with this Order.

[5]    By the end of 2021, the Golans failed to make good on their capital contributions as Dahan loaned to them the funds needed for their capital investment in NAYA.  Dahan sued the Golans in 2019 and, effective January 25, 2022, the parties settled by, *inter alia*, Dahan taking the Golans membership share in NAYA.

adjacent property owner, Shawnee Trucking, addressed to NAYA that offered to pay $7 million

for the Property and $3 million for the business. This LOI appeared to be the perfect exit strategy

for a dishonest member that looted the Company.[6]

69.    Dabah did not share a copy of the LOI with Dahan[7] and misrepresented its terms.

Specifically, Dabah concealed the fact that the LOI contained a critical contingency, *i.e.*, that the

LOI ". . . is subject to the sale of property located at 50 Somerset Place, Clifton, New Jersey."

However, this property never sold since the date of the LOI.

70.    Nevertheless, in October of 2022, NAYA retained the law firm of Gutman Weiss,

P.C. to send a letter to C&C attempting to exercise the Option that C&C had purported to revoke

in 2019.

71.    On October 17, 2022, C&C informed NAYA that it would not accept Plaintiff's

Option asserting that it had been revoked in 2019.

**The Parties Engage in Litigation**

72.    Dahan's suspicion of Dabah only grew and he was convinced that Dabah's efforts

to keep him in the dark about the business's day-to-day operations were calculated to conceal

something nefarious.

73.    After C&C refused to honor the Option, NAYA commenced a Chancery action in

Bergen County, New Jersey against C&C on November 1, 2022, docket number C-000192-22 and

---

[6]    Shawnee was a neighboring trucking company that was adjacent to Arena's property. They were not interested in taking over Arena, but rather just in the property. Shawnee would likely liquidate Arena's inventory and would never do an audit of its books.

[7]    Dahan first saw the actual LOI when it was produced in discovery.

then re-instituted on November 15, 2023, docket number BER-C-000238-23 (the "Option action")

seeking to enforce its right under the Option to purchase the property.

74.    Dabah initiated a separate Chancery action against Dahan on April 11, 2022, docket

number C-000060-22, re-initiated in docket number C-000126-23 on July 11, 2023 (the "Dabah

dissolution action"), seeking dissolution of NAYA.

75.    The dispute between Dahan and Dabah ultimately settled on September 13, 2024,

leaving Dahan the 100% owner of NAYA.

76.    Shortly after the parties settled, on October 15, 2024, NAYA filed a bankruptcy

petition captioned Ch-11 24-20223-VFP (this case).


**<u>Dahan's Worst Fears Are Realized</u>**

77.    After Dahan and Dabah settled, Dahan took over complete control of NAYA in

January of 2025 and, for the very first time, was able to verify that his fears *were* founded.

78.    Dahan found NAYA in a complete state of financial turmoil; a sinking ship, a

company completely defrauded by Dabah.

79.    Dahan hired a full-time individual with extensive experience in the industry to run

NAYA and immediately noticed serious anomalies with NAYA's business.

80.    Dahan engaged the help of a forensic computer expert to uncover files and

documents that were previously hidden or deleted.

81.    The bulk of the documents that were discovered were contained in deleted or hidden

e-mails that were sent to or from Dabah using his NAYA computer and which were backed up to

a central computer network storage device.

82.     These e-mails revealed a spectacular conspiracy to defraud NAYA and reveal a scheme to steal in excess of $9,000,000 from NAYA using a variety of creative ways to accomplish such theft.

83.     Additionally, in time, NAYA's employees who were previously loyal only to Dabah, began to disclose Dabah's dirty secrets.

84.     NAYA's bookkeeper assisted Dahan in piecing together the fraud puzzle and explained that she personally witnessed Dabah deleting and destroying incriminating documents and emails as well as Dabah pocketing over $300,000 in cash.

85.     It is now apparent exactly why Dabah was so insistent that Dahan never have access to the business or its records.

86.     It is also apparent why Dabah never consummated the transfer of Jac Elan to NAYA, since it was critical to his scheme to use Jac Elan as a pass-through entity to commit much of the fraud he committed on NAYA.

**Fraudulent Conveyances**

87.     Dabah purchased 1464 Lafite Court, Toms River, New Jersey 08753 in December of 2020 under his and his wife's name for $998,000 using monies diverted from NAYA while at the very same time that he was representing to the other members of NAYA that the company was not making a dollar of profit and was essentially a sinking ship.  Dabah paid off the original mortgage for 1464 Lafite Court in 2022, and since then has been taking a number of HELOC's on the asset. In mid to late 2024, Dabah took out almost $800,000 additional equity from 1464 Lafite Court and then paid it back within two to three months while saying NAYA is a sinking ship, with money he embezzled from NAYA.

14

88.    The timing of the purchase of 1464 Lafite Court is curious since in May 2020, based on a conversation with Joey Weed, an employee of Jac Elan, Jac Elan was closed from the second quarter of 2020 through March of 2024.  It's suspicious how Dabah could afford such a luxurious second home in a year in which Jac Elan store was closed and while representing that NAYA was not profitable.

89.    Dabah also purchased another residence located at 406 Marc Drive, Toms River, New Jersey in May of 2024 a mere three months after Jac Elan reopened after being closed for 4 years, using monies diverted from NAYA.  The timing of this purchase is also significant because (i) since inception he said that NAYA was not profitable and was on the verge of collapse, and (ii) he purchased this asset originally under his <u>and</u> his wife's name and took out a mortgage with FM Home Loans and then suddenly this property was transferred into the name of straw man Ithamar Aharonov with "seller financing" from Dabah.

90.    406 Marc Drive was later transferred into 406 Marc Drive LLC which according to New Jersey corporate records is an entity controlled by Dabah.

91.    The property was sold in early 2025, right after the settlement with Dahan.  The GIT/Rep-3 form ("Seller's Residency Certification/Exemption) is signed by "Amihai Dabah, Managing Member."

92.    Dabah also purchased an apartment on Haturim Street 1, apartment number 46 on the 9th floor in February of 2020 using monies diverted from NAYA.[8]

93.    Collectively, Dabah – who prior to NAYA lived a very modest lifestyle – amassed several million dollars in real estate with minimal amounts of mortgages or debt.

---

[8]    The investigation is ongoing and NAYA will need to examine banking, CRM, software and accounting records to fill in the details of the fraud.

94.     Dabah also funded the startup and construction of La Sova, a restaurant on East 13th Street in Brooklyn NY in 2024 using monies diverted from NAYA. La Sova is being run by another straw man, Dabah's brother and partner. Dabah actively runs La Sova.

95.     In March of 2024, Dabah undertook a complete renovation of the Jac Elan showroom with NAYA product as part of its relaunch after being closed since the second quarter of 2020 without ever paying NAYA for such product.

96.     Dabah Stole all of NAYA's business IP.

97.     Dabah stole NAYA assets including the office computer he used at NAYA that was paid for by NAYA.

**Dabah's Fraud**

98.     The fraud that Dabah perpetrated was spread over a number of different methods for stealing NAYA's money.

99.     Dabah utilized the office staff at NAYA to assist him in his fraud and had NAYA's employees, namely Ashley Dennis and Ana Milojkovic, act as employees of Jac Elan.

100.    Dabah engaged in a dizzying number of ways to defraud NAYA. Some ways are now apparent, while other ways appear more subtle.

101.    For example, for the first two years of operation, Dabah filed NAYA's tax returns as a single-member LLC acting as though he was the 100% owner of NAYA.

102.    Dabah filing NAYA's return as a single-member LLC was fraudulent.

103.    A few years later, after Dahan began demanding transparency of the books, Dabah began filing NAYA's tax returns as a multi-member LLC, putting each member's respective capital accounts at $360,000

16

104.    Curiously, in the next two years the capital accounts of Dahan and the Golans were reduced to $0 and Dabah's increased triple-fold to $1,080,000.

105.    From the time Dabah assumed the role of self-appointed and unilaterally assumed manager in 2019 until the date he left the Company, he used a sophisticated web of entities and shell companies to shelter the proceeds of his fraud including:  M Plus Holding LLC (now Jac Elan LLC), Mosaic Expressions Plus LLC, Mosaichi LLC, and Jac Elan Projects LLC, all of which share the same address of 1740 East 28th Street, Brooklyn.  In addition, Dabah used other entities including 406 Marc Drive LLC, Emet Holdings LLC, whose members are Amihai Dabah and straw man Ithamar Aharonov. It appears that money, profits or materials that belonged to NAYA were diverted to, or through, these entities.

106.    Dabah purposely blurred the lines that are designed to separate LLCs from one another and the members of those LLCs.  One of the central fraudulent methodologies that pervaded Dabah's fraud scheme was ignoring the separation between NAYA and Jac Elan *only* to NAYA's detriment and **never** to its benefit.

107.    This fraudulent methodology was reflected in specific catch-phrases that Dabah used repeatedly on invoices, payments, requisitions, etc. such as "Historical Adjustment" "Journal entry Credit" "Loan Deduction" "receipt other" "Broken Materials" and "invoice write off". Additionally, when Dabah would take inventory from NAYA for Jac Elan, he would instruct NAYA's employees to have that invoice recorded as if there was fictitious money "due" to Jac Elan by using code-words such as "due to affiliate" or "guaranteed payments."  The net effect of these fraudulent credits were to "zero-out" the invoices so no money would be owed to NAYA for this product, and that Dabah or Jac Elan would be paid directly instead.

108.    The ways Dahan has so far discovered that Dabah defrauded NAYA is as follows:

- **Unpaid Invoices -** Dabah left over $2,300,000 in open invoices unpaid, exposing the company to serious financial liability.

- **Fictitious Credit Memos -** Dabah created fraudulent credit memos totaling over $500,000, falsely claiming that these amounts were owed to an "affiliate" company. However, there were no legitimate transactions that substantiated these memos. Additionally, Dabah created over $100,000 in additional fictious credit memos without actually receiving payment in exchange for those credits as a means to take Arena product and have the full sales proceeds made to other entities like Jac Elan and himself.

- **Project Theft -** Dabah stole existing relationships daily that belonged to NAYA, and diverted more than $4 million worth of projects from NAYA to Jac Elan, eliminating NAYA from supply chains.

- **Cash Theft -** Dabah stole over $700,000 in cash that was paid by customers for NAYA products.

- **Client Redirection -** Dabah interfered with existing relationships with wholesale clients like designers and fabricators who would send clients to NAYA that he diverted to himself, selling them materials from NAYA and collecting payment for those transactions to Jac Elan, himself directly, or another entity he controlled.

- **Misuse of Company Funds -** Dabah ordered materials that he sold through Jac Elan, or another entity he controlled, paying for such with NAYA's bank accounts, and then sold such products for personal profit writing up fictious invoices and credits to Jac Elan severely below cost, let alone average market price.

- **Self-Dealing -** Dabah "sold" NAYA materials to Jac Elan, or another entity he controlled, substantially below cost, depriving the company of profit and the ability to sell such product to proper customers at market rates for profit. Additionally, to add insult to injury even these below-cost sales were never paid to NAYA.

- **Personal Use of Business Accounts -** Dabah used NAYA bank and credit accounts as his personal bank account, paying both personal bills, vacations, cars, high-end dining, every day expenses of his household and expenses of Jac Elan from NAYA funds. Also of note is the unconscionable amount of Amex cash gift cards that were taken out of the business.

- **Falsifying Damage -** Dabah purposely mislabeled NAYA inventory as "broken" which he then took and sold after labeling such as write-offs.

- **Overseas Material Diversion -** Dabah ordered stone materials overseas, paid for such using NAYA's funds and then redirected those shipments directly to Jac Elan and to job sites. Dabah then had NAYA pay the bill to the vendors and redirected 100% of the sales proceeds to Jac Elan, himself or other entities.

109.    The following are some specific examples from each of the above categories of fraud to illustrate how each method was accomplished.

110.    **Unpaid Invoices:** An example of this is as follows: On April 14, 2023, an invoice #3922 was generated to Jac Elan in the total amount of $15,242.86. The inventory on this invoice to Jac Elan is "sold" substantially under market value, *i.e.*, $6 per square foot. Looking at the sales history of the material in this invoice, "Rosa Aurora Polished 2 CM" this same material was sold to other customers for $32 per square foot.   This translates into a more than 80% reduction in the market price for this stone; stated otherwise, Dabah paid less than 1/5 of what the material sold to regular customers.  Additionally, this invoice was never paid and has been sitting in Accounts Receivable since the date of the invoice.

111.    Another example of an unpaid invoice is invoice #3999. The material was "sold" to Jac Elan for $8 per square foot when the same material was sold to regular customers for $40 per square foot. This translates into an 80% reduction in the market price for this stone; Dabah paid 1/5 of what the material sold to regular customers. This invoice is unpaid and has been sitting in Accounts Receivable since the date of the invoice.

112.    On July 21, 2021, an invoice #2773 was generated to Jac Elan. The inventory on this invoice was "sold" to Jac Elan "Bariglio Luca Honed 2 CM" at for $7.85 per square foot which is substantially below market value and below NAYA's cost. Looking at the sales history of the material in this invoice, "Bariglio Luca Honed 2 CM" was sold to other customers for $31 per square foot; This translates into a 75% reduction in the market price for this stone. Additionally, this invoice is unpaid and has been sitting in Accounts Receivable since the date of the invoice.

113.  **Fictitious Credit Memos:**  An example of this is as follows:  On December 2, 2020, Ana, the bookkeeper at NAYA, was instructed to create a fictitious credit memo by Dabah on credit memo #2132 in the amount of $180,000.  No actual return of inventory was made to justify this credit memo as per NAYA's bookkeeper, Ana.   In total, NAYA has discovered so far credit memos written totaling $620,572.38.

114.  Another example, is that Dabah worked closely with his own fabricators who helped him defraud NAYA.  Specifically, NAYA would typically supply a fabricator with product for a customer that the fabricator was dealing with directly and that fabricator would pay NAYA for the product provided to it for cutting and installation for that customer.  When a customer would come into NAYA through one of NAYA's trusted fabricators, Dabah would divert them to one of his "trusted" fabricators, provide that fabricator with product from NAYA, give that fabricator a fake credit memo for the goods to "zero-out" the invoice and then either the fabricator or the client would pay Dabah or Jac Elan directly for those goods.  NAYA never saw a dime from these sales.

115.  One of Dabah's "trusted" cohorts was Faithful Countertops.  For example, on June 18, 2024, Dabah created a credit memo for Faithful Countertops on a document entitled "Reference# ZERO OUT 50#4644".   In this credit memo, Dabah issued a credit memo for $4,898.96 "TO ZERO OUT OUTSTANDING INVOICE #4644."  There is no recorded payment to NAYA for Invoice 4644.

116.  **Project Theft:**  An example of this is as follows:  NAYA's sales team were contacted to bid on a project called "150 Main Street" located in Hackensack, New Jersey, that was valued at over $600,000 in potential profit for NAYA Stone.   Instead of engaging in the project on behalf of NAYA, Dabah diverted the business, and entered into the project under Jac Elan as the supplier.  In fact, the project manager wrote to the individual that Dabah put in charge

of the project saying "we have been dealing with Arena Stone since the very beginning. It's a little bit confusing . . ." Dabah redirected this client to Jac Elan, completed the project, and had the full proceeds of the sale directed to Jac Elan or another entity.

117.    In another project relating to a hotel, a lead e-mail was forwarded to NAYA sales team from Infinity Surfaces of someone seeking Infinity Surfaces products. NAYA had an exclusive distribution contract with Infinity Surfaces. Dabah had Tamir Nachum, a Jac Elan Employee, contact the interested party (from Tamir's Jac Elan e-mail address) and sent them a link to www.arenastonenj.com to sell them NAYA products under Jac Elan. To add insult to injury, NAYA paid for the inventory in full, the customer was stolen from NAYA, the full proceeds of the sale were paid to Jac Elan, and Jac Elan never paid NAYA for the material. Additionally, Dabah then had NAYA pay Tamir and himself a commission for that sale from NAYA.

118.    Another example is that NAYA has an exclusive agreement with Infinity Surfaces, an Italian porcelain manufacturer. Infinity received a request for materials intended for a project in Washington, D.C. This email request was initially forwarded to Dabah, however, he had an employee of Jac Elan respond to the email and offered to ship out the requested samples under their own brand. The e-mail at issue identifies Arena Stone as the authorized distributor of Infinity.

119.    Another example of how Dabah stole opportunities from NAYA was that he sold Infinity branded porcelain that NAYA had an industry exclusive and sold them through Jac Elan at the store. For example, on April 25, 2023, Tamir Nachum, a Jac Elan employee, sent an e-mail providing information to Joey Weed at Jac Elan (with Dabah copied) regarding Infinity slabs that were being used for a Jac Elan showroom stating "no charge for slabs."

120.    In fact, Tamir Nachum used an e-mail address "tamir@jacelan.com and his email signature included as follows:

Tamir Nachum

21

JAC ELAN [The Art of Tile]
30 West 22nd Street
New York, NY 10010
C 718.314.8638
T 212.255.3022
Tamir@JacElan.com
Www.jacelan.com
Www.arenastonenj.com

121.    In an e-mail from Infinity to Dabah (at his arena email address, Ami Dabah

ami@arenastonenj.com) and to Tamir, Infinity wrote:

> Hello Tamir and Ami, I am working with a fabricator for the
> Calacatta Oro Stone. The fabricator advised that they placed an
> order with Arena Stone. The company name is Stone Haven and the
> persons name is Amildo Cianchetta. Would you please confirm if
> you see an order from them? Thank you.

Tamir ultimately reached out to that customer and sold the product from Jac Elan and had the full

sale proceeds sent to Jac Elan while NAYA paid for 100% of the inventory.

122.    Jac Elan also stole another project from a client of NAYA, Sky Construction

Management in February of 2024.

123.    Fabricators and designers are NAYA's clients that send *their* clients to NAYA to

choose material. When these partners of NAYA referred customers, they would lose those clients

because Dabah would divert them to Jac Elan who sold to them direct. Not only did NAYA lose

those specific customers, NAYA's partners lost their customers they were sending to NAYA (as

Dabah paired them up with his fabricators and designers) and ultimately the relationship NAYA

had with those referring fabricators and designers (the foundation of NAYA's clientele base) ended

when they realized that their clients were being stolen from them by Dabah.

124.    **Cash Theft:**  An example of this is as follows: On November 11, 2019, invoice

#0778 was created for a total amount of $7,545. On the invoice there are notes from NAYA's

bookkeeper, Ana Milojkovic, saying that the invoice was paid in cash.

125.    Another example is invoice #2961 in the amount of $24,676.34.  The invoice states that it was paid in cash.

126.    As per NAYA's bookkeeper, Ana Milojkovic, all cash from cash sales was handed to Dabah which she estimates to be "at least" over $300,000.

127.    Additionally, NAYA discovered an invoice #2048 which appears to be an invoice to Jac Elan for $411,815 but also notes that payment was received in cash by NAYA.

128.    Dabah used NAYA employees to help him in his fraud.  Such examples include using the office staff for Jac Elan sales, using the warehouse staff to facilitate packing and delivering of "Jac Elan Orders," using the company vehicles for Jac Elan deliveries, storing pallets of Jac Elan and La Sova supplies, and personal materials at NAYA's warehouse.

129.    As one of many examples, on April 18, 2023, Ashley Dennis who works for NAYA wrote an accounting memo to Arena's bookkeeper Ana Milojkovic memorializing a number of cash payments that Dabah took including the following entries: "KV Stone came in first thing in the morning and picked up one slab I paid cash for SO: 3891 ($506) which was given to Ami while he was on site."  "Ami had an uber sent to the office to pick up a UPS box with the checks/cash to deposit" "SO: 3909 - 2k cash deposit given onsite by Artistic owner - cash went in the box with checks to Ami."

130.    **Client Redirection**:  An example of this is as follows:  NAYA discovered a quote on invoice #3151-1.  According to Marina, a sales person at NAYA, this customer came to NAYA and looked around at stone they were interested in, Marina gave them a quote of what it would cost them based on what they chose, and after the customer left, Dabah told NAYA's employees to create invoice #4406 for that very customer from the quote mentioned above and the same material they chose which was invoiced to Jac Elan with the customer's name at below actual

landed cost and 4x below market value which Jac Elan then sold to that same customer at regular market value.

131.    Another example of the same situation is Quote #2705-1 and invoice #3922. The customer came to NAYA, Marina walked around with the customer and helped them choose stone, and then Dabah placed an order under Jac Elan for the same customer, same material and a price below actual landed cost and unconsciously below market value, and then Jac Elan sold that material to this customer at market value.  Jac Elan never paid NAYA for these materials and Jac Elan received the full benefit of the sale.

132.    **Misuse of Company Funds**:  Dabah misused NAYA's resources and money in a number of different ways including paying for product that was really being used by Jac Elan, paying for Jac Elan expenses using NAYA's bank accounts, and paying Jac Elan employees out of NAYA's accounts for work performed for Jac Elan via commissions and American Express gift cards.  Dabah also paid for all of his and his family's personal expenses from NAYA bank accounts, was constantly redirecting sales proceeds to himself to buy homes and assets, and misused NAYA's purchasing power with vendors to buy product for Jac elan at advantageous rates and credit terms.

133.    **Self-Dealing**:  An example of this is as follows:  An example of self-dealing is in invoice #4782. The material was sold to Jac Elan for $6 per square foot when the sales history of the same material shows it was sold to customers for $18.50 - $21 per square foot .

134.    Another example is invoice No. 4406 in which Dabah "sold" to Jac Elan material for $12 per square foot when the sales history for the same exact material shows that it was sold to other customers for $65- $128 per square foot. Jac Elan eventually sold these products for market value and kept 100% of the proceeds and never paid NAYA for the material, or labor costs associated with the sale.

24

135.    Another example of how Dabah stole product from NAYA and engaged in self-dealing was in March of 2024 when Dabah was building the La Sova restaurant together with fellow straw men his brother Amnon and Yonathan their third partner.  Dabah created a sales order in the system labeled "ami personal" and took material below cost to use at La Sova and sent the material to one of NAYA's fabricator, Faithful Countertops, on Invoice No. 17236 on March 14, 2024.  Dabah billed the fabrication to NAYA, then he generated an invoice to La Sova on Invoice #4504 billing "Quarzite Smeraldo Polished 2cm" to them at $17.35 per sq. ft. Based on sales to other customers, specifically a sale to a different client on Invoice 3597 this exact material sold for $95.00 per sq. ft.  Just like all the other self-dealing transactions, Dabah took an unauthorized reduction of over 80% and paid 1/5 of what the material sold to regular customers and never paid NAYA even one penny for the product.

136.    Dabah regularly "sold" NAYA product to himself or Jac Elan below cost and/or well below the market price that NAYA was selling those same products to its other customers and did not pay NAYA for that material; even after the egregious invoice fraud in which below market or cost numbers were fabricated at his direction.

137.    **Personal Use of Business Accounts**:  An example of this is as follows:  Dabah purchased the following gift cards on the Company American Express:

- 12/21/23: AMEXGIFTCARD.COM-BOL 0244, $4,253.65
- 12/15/22: AMEXGIFTCARD.COM-SOL 0244, $4,951.60
- 05/20/22: AMEXGIFTCARD.COM-BOL 0244, $5,901.65
- 03/16/22: AMEXGIFTCARD.COM-BOL 0244, $1,821.90
- 09/18/20: AMEXGIFTCARD.COM-BOL 0244, $1,014.90
- 07/01/20: AMEXGIFTCARD.COM-BOL 0244, $1,039.65
- 02/23/21: AMEXGIFTCARD.COM-BOL 0244, $2,014.90
- 12/23/20: AMEXGIFTCARD.COM-BOL 0244, $3,051.65

The total for these gift cards is $24,049.90.

138.    Dabah also purchased airfare for himself and his wife Elana on March 14, 2024, for a total of $4,173.60 for a trip to Milan, including hotel, car and restaurant for a week beyond an industry trade show. Additionally, Dabah would pay for cruises and other leisure activities for him and his spouse and family and pay for numerous family and personal expenses.

139.    Dabah spent money at restaurants, Cadillac of Manhattan for his wife's car ($2,357.59 on July 9, 2024, and $2,150.00 on February 8, 2023), cruise vacations ($671.25 on December 15, 2019 at "SI PROMOS, ON-BOARD CRUISE SHOP"), and thousands more on personal expenses.

140.    Dabah spent the following at the Apple store:

- 12/11/19 - APPLE STORE R117 R117, PARAMUS, NJ - $744.25
- 02/21/23 - APPLE ONLINE STORE, CUPERTINO, CA - $115.16
- 03/28/22 - APPLE ONLINE STORE, CUPERTINO, CA - $1,331.75
- 07/10/20 - APPLE ONLINE STORE, CUPERTINO, CA - $692.00
- 04/13/20 - APL APPLE ONLINE STORE, CA - $3,174.23

141.    Among the plethora of personal expenses that Dabah charged to NAYA, the following egregious examples stand out:

- AMZN Mktp US A42Z473K3, Amzn.com/bill WA, on 01/26/20 for $8,426.92.
- Hyatt Regency Orlando, on 04/11/20 for $732.86.
- Little Loungers (a baby clothing store in Lakewood, NJ) on 04/04/24 for $569.24.
- Morales Auto Glass Window, on 02/21/23 for $543.75.
- Executive Collisions, Misc, on 01/04/23 for $685.00.
- Jaguar Land Rover Man, Auto Dealer (NEW/USED), on 03/02/22 for $1,479.31.
- Executive Collisions, Misc, on 09/23/22 for $1,500.00.
- B&H Photo-Video Retail 0848700006686, on 04/12/21 for $681.41.
- Potterybarn.Com, Home Furnish, on 02/17/20 for $1,224.05.
- From You Flowers, Flowers, on 03/30/21 for $236.23.
- Oh Nuts Inc-Flatbush, on 02/25/21 for $239.50.
- From You Flowers, Flowers, on 01/13/21 for $165.25.
- Marks Asphalt 0000, on 11/18/20 for $1,000.00
- ESTIHANA RESTAURANT: 12/22/2022, $297.10
- AMERICAN AIRLINES: 06/15/2022, $1,229.37

- ▪ HOTEL HAUSEN (Germany) 06/23/2022, $193.05
- ▪ FILLERUP K WINES (liquor store) 12/12/19, $494.78.

142.    **Falsifying Damage:**  An example of this strategy to defraud NAYA is as follows:
In Stone Profits, the computerized inventory system used by NAYA, there is an option to write-off inventory that is genuinely broken or otherwise damaged.  This option is used for inventory that NAYA paid a supplier for but was received damaged and cannot be sold to customers.  This might occur during the shipping process *en route* from overseas or in the process of moving inventory around at NAYA's warehouse.  Dabah exploited this by marking perfectly good material as damaged, broken etc., rendering its value as zero, and then would sell that very material through Jac Elan without paying NAYA for it and keeping the full sale proceeds.

143.    For example, on one document material described as "Ardesia Black Honed 2 CM," 10 slabs were written off and in the internal notes it is written "Material is for Jac Elan". The write-off option was used by Ami to take that material for free from NAYA without ever invoicing it to Jac Elan or to a customer and then removing it from inventory.

144.    **Overseas Material Diversion**: Dabah ordered stone materials overseas, paid for such using NAYA's funds and then redirected those shipments directly to Jac Elan and to job sites. An example of this is as follows:  Dabah purchased materials under Jac Elan and paid for it from NAYA's accounts.  Examples include purchase orders #20-002, 34-002 and more. These invoices are invoices to Jac Elan with Jac Elan's name and address. NAYA's bank statements reflect payments made for those exact purchase orders with NAYA not receiving any money from Jac Elan.

145.    Another example is that on May 16, 2023, Dabah wrote to Ana Miljojkovic, Arena's Bookkeeper as follows: "This is arriving on June 3rd. I need this released and brought to the warehouse ASAP, top priority please."  The e-mail attached bills of lading that showed that a

"Container Said to Contain 13 CRATES" described as "MARBLE SLABS" was being shipped from Italy to the listed buyer as "JAC ELAN Address: 30 W 22ND STREET NEW YORK USA 10010." The consignee, who is the party responsible for payment is listed as "ARENA STONE 690, WASHINGTON AVE CARLSTADT NEW JERSEY USA 02072." It is believed that these materials were paid for by NAYA and redirected by Dabah to be sold through Jac Elan.

**Dabah Negligently Mismanaged NAYA**

146. During the majority of NAYA's existence, Dabah was successful in blocking Avi's access to the Company thus concealing his fraud and gross mismanagement.

147. It was only once Dahan finally obtained unfettered access to the Company in January of 2025 that he was able to retroactively see the magnitude of Dabah's damage to the Company.

148. Dabah did not put one penny of his own money into NAYA. Because he had no skin in the game, Dabah used NAYA as his personal piggy bank account and its stone yard as a free source of goods for Jac Elan and himself and handled NAYA's business operations in a completely fraudulent and reckless manner.

149. At all times that Dabah was a member of NAYA, by his own design, was the only member that had control or management of the company. The fact that Dabah purposely excluded Avi was calculated to ensure that Dabah's damage to the Company go undetected.

150. While he was the controlling manager of NAYA, Dabah grossly mismanaged NAYA and negligently made critical managerial decisions that were detrimental to NAYA.

151. One of the many acts of Dabah's negligence that harmed NAYA was that he neglected to create any form of acknowledgment for the $334,000 NAYA paid to C&C at the closing for the business. When C&C later made a claim that NAYA owed it $501,206.19 towards

28

the balloon payment on the APA Note, Dabah was negligent in not asserting that the $334,000 that NAYA paid to C&C at the closing towards the APA Note be credited. This neglect and failure to initially document the payment, compounded by Dabah's negligence in not asserting it as a credit on the balloon payment caused NAYA an unnecessary loss of $334,000.

152.    Dabah was further negligent in not having an attorney at the closing and by not insisting on a closing statement that detailed what, or how, NAYA paid C&C.

153.    Prior to the closing, the Herrick Firm was heavily involved in the negotiations.

154.    One of the critical terms that the Herrick Firm was negotiating on behalf of NAYA was that the lease payments to C&C be credited toward the purchase price of the property. In fact, on December 20, 2018, Avery Mehlman, Esq. ("Mehlman") at the Herrick Firm wrote to C&C "…it is my client's position that the Lease Payments reduce the purchase price of the Property- this is what was discussed - Please advise. Thanks."

155.    On December 24, 2018, C&C's representative confirmed and wrote:

> Avery, **I spoke with Michael Coiro** who has been handling the negotiations on behalf of his father. He informs me that the issue concerning the Note payments **was discussed in detail with Purchaser and the Parties agreed to the following**: . . . Utilizing an interest rate of three (3%) percent per annum, Seller will extend to Purchaser **a credit on the Purchase Price** for that part of the fifteen thousand ($15,000.00) dollars monthly installment payment which represents a principal payment **in accordance with the attached amortization schedule**.

156.    As part of this communication, C&C sent an "amortization schedule" detailing specifically how each monthly Lease payment would be applied to the purchase price.

157.    Based on the amortization schedule, NAYA was supposed to receive a total credit of approximately $837,447 toward the purchase price from the seller.

158.    Dabah chose not to have, or otherwise failed to have, the Herrick Firm or other legal counsel at the closing to review the documents that were presented for him to sign at the

closing and to ensure that only those terms that were agreed were included and that none of those terms were omitted.

159.    Critically there were a number of surprises in the agreements that Dabah signed including, most critically, that C&C omitted any reference to the lease credits even though they explicitly agreed to do so during negotiations.

160.    Additionally, C&C slipped in enough contradictory or confusing terms to allow it a back-door out of their obligations.  For example, the documents acknowledged on the one hand that the Option to purchase the property was "irrevocable" but elsewhere that "Should a Default occur as to the Note which Default Buyer fails to cure within thirty (30) days of receipt of written Notice of Default, **the Option** Agreement for the Purchase of the Real Estate referenced herein below **shall be void and withdrawn** and have no further force and effect."  This last competing clause rendered the "irrevocable" clause meaningless.

161.    Had an attorney been present at the closing and reviewed what Dabah signed on behalf of ~~the~~ NAYA they certainly would have protected NAYA.

162.    Additionally, had Dabah exercised reasonable and prudent caution, he would not have signed agreements that (i) did not include material terms negotiated by NAYA, and (ii) contained provisions that allowed C&C to cancel the Option and forfeit NAYA's Deposit on technical "gotcha" defaults.

163.    Dabah's negligence relating to the closing documents caused real damage.  For example, with respect to the lease credits, C&C argued that the closing documents did not memorialize any such agreement costing NAYA almost a million dollars.

164.    Despite the fact that the Lease agreement with C&C required *them* to pay for all utilities, Dabah negligently paid all of the utilities including electric, gas, and garbage disposal. C&C never paid any of the PSE&G bills, and instead Dabah caused NAYA to pay more than

$170,000 in electric and gas to PSE&G, as well as other utility charges that NAYA was not required to pay.

165.    Because Dabah completely obstructed Avi's access to any information relating to the business, he had no way of knowing the damage that Dabah was doing to NAYA.

166.    C&C also claimed that NAYA could not collect damages for either the utilities or the lease credits because Dabah negligently failed to make such claim when he filed the action against C&C.[9]

167.    Dabah's negligence in the way in which he closed the transaction with C&C caused substantial loss to NAYA and forced it to engage in extensive litigation that would have been avoided but for his negligence.

168.    Another example of negligent mismanagement was that Dabah caused NAYA to pay the monthly utilities including gas, electric and waste management after it began its tenancy at C&C's property even though Section 3.1(a) of the Lease Dabah negotiated with C&C stated that "Landlord shall pay all real estate taxes and provide utilities at no cost to Tenant."

169.    Accordingly, the monies that Dabah caused NAYA to pay for such utilities amounts to negligent corporate waste.

170.    Additionally, Dabah caused NAYA to pay $500,000 for the Option to purchase the property.  However, in 2019 when C&C explicitly communicated to Dabah that it was cancelling the Option, Dabah chose to stay quiet and do nothing.

---

[9]    After Dahan took over NAYA, at the very next conference his new attorney, Michael M. Cohen, Esq. requested leave to amend the Complaint to add causes of action and facts that were neglected to be added by Dabah, however, the Chancery Judge denied such stating that it was too late particularly because the discovery period had long close.

171.    Dabah later, in October of 2022, tried to exercise the Option, however, it was too late as C&C already revoked the Option and Dabah did nothing to address such revocation.

172.    Dabah's decision to stay quiet ended up costing NAYA approximately $2M in additional costs and expenses it would otherwise would never have to incur but for Dabah's mismanagement.

173.    Dabah's mismanagement in total cost the company approximately $3.5M in total losses aside from the monies he separately stole from the company.

## COUNT I

*Fraud*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah**

174.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

175.    Under N.J.S.A. 42:2C-39, members and managers of a New Jersey LLC owe fiduciary duties to the company and other members, including a duty to refrain from fraudulent acts and from using company assets for personal benefit.

176.    Defendant Dabah, while acting as a self-appointed and unilaterally assumed managing member of NAYA, engaged in a deliberate and systematic scheme to defraud NAYA, its members, and its creditors through embezzlement of funds, material misrepresentations, omissions, concealment, and deception.

177.    Throughout his control of NAYA, Dabah knowingly and intentionally made false statements and concealed material facts for the purpose of misleading co-member Dahan and diverting company assets and opportunities for his personal benefit.

178.    Among other fraudulent acts, Dabah falsely represented that: (i) he would contribute Jac Elan to NAYA as part of his capital contribution; (ii) NAYA was not profitable and

therefore could not make profit distributions; (iii) all financial and operational matters were being properly handled; and (iv) he would use investor funds solely for legitimate business purposes of NAYA.

179.    In reality, Dabah: (i) never transferred Jac Elan to NAYA, but continued to operate it independently and used it to compete with and siphon off opportunities from NAYA; (ii) diverted over $9 million in projects, clients, materials, and revenue from NAYA to Jac Elan or other entities he controlled; (iii) misappropriated NAYA funds for personal and family use, including luxury expenses, travel, and gift cards; (iv) created fictitious credit memos, mislabeled inventory as broken as a means of taking material without creating a liability of money (i.e. he wrote them up as broken to take the material for free) material that was not broken, and used company resources to benefit unrelated entities and personal dealings; and (v) actively deleted and concealed records, emails, documents and financial data to cover his fraudulent conduct and prevent detection by Dahan or any other party.

180.    Dabah's fraudulent conduct was not the result of mistake, negligence, or oversight. It was intentional, calculated, and malicious, designed to enrich himself at NAYA's expense and to mislead those with a legal and financial interest in the company's success.

181.    Dabah's fraudulent acts have caused NAYA severe and measurable harm, including but not limited to the loss of over $9 million in diverted revenues, physical cash, unnecessary overpayments to previous seller, unpaid liabilities, reputational damage, and the imposition of unnecessary legal fees and business disruptions.

182.    NAYA and it member(s) relied on Dabah's material misrepresentations and omissions to its detriment, and such reliance was foreseeable and proximately caused the damages suffered by NAYA.

183.    Dabah's conduct constitutes common law fraud, and entitles NAYA to an award of compensatory damages, punitive damages, and equitable relief.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a. Declaring that Defendant engaged in fraud against NAYA;

b. Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $9,600,000;

c. Awarding punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

d. Imposing a constructive trust over all profits, proceeds, and assets obtained by Defendant through fraud;

e. Ordering the disgorgement of all funds misappropriated or wrongfully obtained by Defendant;

f. Awarding Plaintiff the costs of suit, including reasonable attorneys' fees, forensic expert fees, and investigative costs; and

g. Granting such other and further relief as the Court deems just and proper.

## COUNT II

*Fraudulent Transfers*
(11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550
**Against Amihai Dabah and the Transferee Defendants**

184.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

185.    During the period in which Dabah exercised self-appointed and unilaterally assumed control over the Debtor, NAYA, he engaged in a series of transfers, diversions, and misappropriations of NAYA's property, assets, and opportunities for the benefit of himself, his wife, affiliated entities under his control, and certain insiders, including but not limited to: (i) transferring inventory, sales proceeds, and customer relationships from NAYA to Jac Elan LLC,

Mosaic Expressions Plus LLC, M Plus Holding LLC, and Jac Elan Projects LLC without reasonably equivalent value or any consideration; (ii) utilizing NAYA's funds to pay for the acquisition, improvement, and mortgage obligations of real property, including 1464 Lafite Court and 406 Marc Drive, Toms River, NJ; (iii) using NAYA's funds to purchase international inventory later diverted to or paid for by Jac Elan and sold for Dabah's personal benefit; (iv) funding the construction and launch of the La Sova restaurant, titled in the name of his brother or under assumed names, from embezzled corporate funds; and (v) paying personal expenses including international travel, luxury goods, and American Express gift cards with NAYA's corporate credit accounts.

186.    These transfers were made or caused to be made by Dabah with actual intent to hinder, delay, or defraud creditors of the Debtor, including but not limited to co-members, vendors, suppliers, taxing authorities, and parties in litigation, in violation of 11 U.S.C. § 548(a)(1)(A).

187.    Alternatively, these transfers were made without the Debtor receiving reasonably equivalent value in exchange, at a time when the Debtor: (i) was insolvent or became insolvent as a result of such transfers; (ii) was engaged in business or was about to engage in business or a transaction for which the Debtor's remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as they matured;  in violation of 11 U.S.C. § 548(a)(1)(B).

188.    The property transferred included, but is not limited to, substantial monetary assets, inventory, and business opportunities integral to NAYA's operations, which were diverted to insiders and/or entities controlled by Dabah.

189.    Under 11 U.S.C. § 550(a), Plaintiff may recover the value of the property transferred from: (i) the initial transferee of such transfer or the entity for whose benefit such

transfer was made; and/or (ii) any immediate or mediate transferee of such initial transferee, except as limited by 11 U.S.C. § 550(b).

190.    The following defendants are believed to have received fraudulent transfers or are transferees of fraudulent transfers: Jac Elan LLC, Jac Elan Projects LLC, Mosaic Expressions Plus LLC, M Plus Holding LLC, EMET Holdings LLC, 406 Marc Drive LLC, Arena Stone RE LLC, La Sova operating under a John Doe Corporation, Ithamar Aharanov, Amnon Dabah, and Yonatan Suliman-Zada.

191.    Plaintiff is entitled to avoid and recover the fraudulent transfers made by or for the benefit of Dabah, and to obtain judgment under 11 U.S.C. §§ 548 and 550, including for the value of all property so transferred and for any further relief the Court deems just.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

    a.  Avoiding the transfers made by the Debtor as described herein pursuant to 11 U.S.C. § 548;

    b.  Directing that the Plaintiff may recover the value of such transfers from the Defendants under 11 U.S.C. § 550;

    c.  Awarding compensatory damages, attorneys' fees, interest, and costs; and

    d.  Granting such other and further relief as the Court deems just and equitable.

## COUNT III

*Breach of Fiduciary Duty*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah**

192.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

193.    At all relevant times, Dabah was a one-third member and the self-appointed and unilaterally assumed managing member of NAYA, and as such owed fiduciary duties of loyalty, care, good faith, and fair dealing to NAYA and its member(s).

194.    Under N.J.S.A. 42:2C-39(a), a member in a member-managed LLC is obligated to act in accordance with the duty of loyalty and the duty of care. These duties include: (i) refraining from competing with the company; (ii) not taking company opportunities for personal benefit; (iii) acting with the care a reasonably prudent person would exercise; (iv) avoiding self-dealing or using company property for personal gain without disclosure or consent.

195.    At all times relevant hereto, Defendant Dabah was a member and self-appointed and unilaterally assumed managing member of NAYA, and in that capacity owed fiduciary duties of loyalty, care, honesty, and good faith to NAYA and its other members.

196.    As the controlling and self-appointed and unilaterally assumed managing member of NAYA, Dabah was entrusted with exclusive access to the company's financial accounts, operational decision-making, and strategic execution. He undertook a duty to act in NAYA's best interests and to refrain from engaging in self-dealing, fraud, or actions adverse to the company's welfare.

197.    Despite these obligations, Dabah engaged in a prolonged and deliberate course of misconduct, including but not limited to: (i) denying co-members access to financial records, bank accounts, and critical business information; (ii) diverting company funds and profits for personal use including using NAYA funds to purchase property in the United States and abroad; (iii) paying personal and family expenses from NAYA's accounts; (iv) using NAYA employees and assets to benefit businesses controlled by Dabah, such as Jac Elan LLC and Jac Elan Projects LLC; (v) failing to disclose or pursue legitimate business opportunities for NAYA's benefit, including diverting lucrative business opportunities belonging to NAYA in excess of $6 million;  (vi) grossly

mismanaging company funds, including payment of utility bills that were C&C's contractual responsibility under the lease, (vii) allowing the lapse of the Option to purchase the company's warehouse despite the company's significant investment in securing that right, (iix) stealing NAYA's existing and new clients, and (ix) ruining wholesale relationships that Arena cultivated.

198.    Dabah breached these fiduciary duties in numerous material respects, including but not limited to the following: (i) excluding co-member Dahan from all access to financial records, company books, and operational information while embezzling from the Company and exercising unilateral control over the company; (ii) misappropriating company funds for personal use, including luxury travel, gift cards, and other non-business expenses; (iii) using NAYA's personnel and assets to fulfill projects for competing entities under his control, namely Jac Elan LLC and Jac Elan Projects LLC; (iv) diverting corporate opportunities and customer accounts that belonged to NAYA to his own companies, in violation of the corporate opportunity doctrine; (v)  failing to maintain accurate books and records, and deliberately concealing financial data from NAYA's members; (vi) allowing critical rights—such as NAYA's $4 million Option to purchase its property—to lapse due to inaction and failure to obtain legal counsel, failing to document the $334,000 payment, and other failures to act as a proper fiduciary; and (vii) paying over $170,000 in utilities that were contractually the landlord's responsibility, resulting in unnecessary waste of company resources.

199.    Additionally, Dabah failed to prepare or execute an operating agreement, despite repeated requests, thereby leaving the company without clear governance structures while continuing to unilaterally exercise control.

200.    Dabah's actions were not merely negligent but were calculated to enrich himself at the expense of NAYA and to conceal his misconduct by keeping co-member Dahan in the dark.

201.    As a direct and proximate result of Dabah's breaches of fiduciary duty, NAYA has suffered substantial damages, including but not limited to lost profits, diverted revenues, misappropriated assets, legal fees, reputational harm, and the imposition of unnecessary financial liabilities.

202.    Dabah's conduct constitutes a willful and malicious breach of his fiduciary duties, warranting the imposition of compensatory and punitive damages, as well as equitable relief.

203.    As a direct and proximate result of the Shroff defendants' breach of fiduciary duty, Plaintiffs have sustained substantial damages in the form of lost profits generated through the purchase and operation of the Property

204.    Dabah's conduct violated both his statutory duties under N.J.S.A. 42:2C-39 and New Jersey common law governing fiduciary relationships, and he must be held personally liable for the harm caused thereby

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a. Declaring that Defendant breached his fiduciary duties of loyalty, care, and good faith to NAYA;

b. Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $9,600,000;

c. Awarding punitive damages as appropriate under applicable law based on the willful and egregious nature of Defendant's conduct;

d. Ordering disgorgement of all funds misappropriated or obtained through breaches of fiduciary duty;

e. Imposing a constructive trust on all assets, interests, and proceeds derived from the breach;

f. Awarding Plaintiff costs of suit, including reasonable attorneys' fees and expert witness fees; and

g. Granting such other and further relief as the Court deems just and proper.

## COUNT IV

*Negligent Management of NAYA*
(Violation of N.J.S.A. 42:2C-39 and Related Duties)
**against Amihai Dabah**

205.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

206.    At all times relevant hereto, Defendant Dabah was the self-appointed and unilaterally assumed managing member of NAYA, and was solely responsible for overseeing its operations, finances, business development, and legal affairs.

207.    Under the New Jersey Revised Uniform Limited Liability Company Act ("NJRULLCA"), including but not limited to N.J.S.A. 42:2C-39(a) and (b), a member of a member-managed LLC owes to the company and the other members the duties of loyalty and care.

208.    Pursuant to N.J.S.A. 42:2C-39(b), the duty of care requires a member to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law in the conduct of the company's activities and affairs

209.    As self-appointed and unilaterally assumed manager, Dabah owed NAYA a duty of care to manage the company's affairs in a prudent, diligent, and competent manner, in accordance with reasonable business judgment and industry standards.

210.    Despite this duty, Dabah breached this duty in that he grossly mismanaged NAYA by failing to implement basic operational, financial, and legal safeguards, and by engaging in a pattern of negligent conduct that materially harmed the company.

211.    Among other acts of negligence, Dabah: (i) failed to retain legal counsel at the closing of NAYA's acquisition of Arena Stone, resulting in a lack of documentation, acknowledgment of payments, and critical protections for NAYA; (ii) caused NAYA to make over $170,000 in utility payments that were contractually the responsibility of the landlord under the

lease;  (iii) failed to obtain or record proper documentation acknowledging NAYA's $334,000 deposit toward the Asset Purchase Agreement, jeopardizing NAYA's rights in litigation and business negotiations; (iv) failed to timely act or retain legal counsel when C&C terminated the Option to purchase the company's warehouse, resulting in loss of negotiating leverage and exposure to nearly $2 million in avoidable liabilities; (v) mismanaged NAYA's internal governance by refusing to adopt or execute an operating agreement despite repeated requests by co-member Dahan; (vi) failed to implement internal financial controls, recordkeeping procedures, or safeguards against self-dealing, leaving the company vulnerable to theft and misuse of funds; and (vii) exercised unilateral control over NAYA's operations while actively denying co-member Dahan access to financial records, bank accounts, and critical business information, in direct contravention of N.J.S.A. 42:2C-37(a), which entitles members to access company records.

212.    Dabah's negligent mismanagement is further evidenced by his failure to secure NAYA's rights under the Option to purchase the property. Despite NAYA paying $500,000 as a deposit for this Option, Dabah failed to act when C&C explicitly communicated its termination of the Option in 2019. This inaction, and his failure to seek legal advice or retain an attorney to assert NAYA's rights led to the eventual revocation of the Option.

213.    Furthermore, Dabah's negligence in handling the Option directly resulted in NAYA incurring nearly $2 million in avoidable expenses. Had Dabah taken timely and appropriate legal action when C&C initially terminated the Option, these significant costs to NAYA could have been prevented.

214.    Dabah's negligent management is further demonstrated by his failure to ensure that crucial negotiated terms were included in the closing documents for the C&C transaction. Despite the Herrick Firm's efforts to negotiate on NAYA's behalf, specifically regarding the crediting of lease payments toward the property purchase price, Dabah inexplicably signed agreements that

41

omitted any reference to these vital lease credits. Dabah's negligence just on the lease credits alone cost NAYA $777,447.

215.   Compounding this negligence, the agreements Dabah signed contained contradictory and confusing terms, such as simultaneously stating the Option to purchase was "irrevocable" while also allowing for its voidance upon a default of the Note. A reasonably prudent manager, especially one who had retained legal counsel like the Herrick Firm for review, would have identified and rectified these critical inconsistencies to protect NAYA's interests. Dabah's negligent failure to have the Herrick Firm or other legal counsel review the final documents he signed at closing directly led to significant financial detriment to NAYA.

216.   As a direct and proximate result of Dabah's negligence in handling the closing documents, NAYA suffered substantial and demonstrable harm. C&C subsequently argued in litigation that the closing documents did not memorialize any agreement regarding lease credits. Furthermore, C&C claimed NAYA could not collect damages for either utilities or lease credits because Dabah failed to assert such claims when he initially filed the action against C&C. This direct link between Dabah's negligent actions at closing and the subsequent financial detriment and litigation exposure to NAYA underscores the severity of his mismanagement.

217.   Dabah's consistent representation that NAYA was "broke" while simultaneously making critical financial decisions without Dahan's knowledge or access to records further demonstrates gross negligence. This lack of transparency and unilateral control prevented proper oversight and contributed to NAYA's financial turmoil.

218.   The ongoing litigation that NAYA was forced to engage in, including the Option action and the eviction action, was a direct consequence of Dabah's negligent handling of the C&C transaction and the subsequent revocation of the Option. These legal battles drained company

resources and were unnecessary had Dabah exercised reasonable and prudent caution in managing NAYA's legal and contractual affairs.

219.    Dabah's negligent management was exacerbated by his refusal to provide co-member Dahan with any access to business records, financial accounts, or operational information, thereby depriving the company of transparency, accountability, and effective oversight.

220.    Dabah's mismanagement was not simply poor judgment; it was systemic, reckless, and demonstrated a gross indifference to the welfare of the company and its members.

221.    As a direct and proximate result of Dabah's negligent management, NAYA has incurred substantial damages, including but not limited to unnecessary utility payments, lost business opportunities, litigation exposure, and increased financial liabilities in an amount to be determined at trial.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a. Declaring that Defendant negligently managed the operations and affairs of NAYA;

b. Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $3,500,000;

c. Awarding Plaintiff costs of suit, including reasonable attorneys' fees, expert fees, and litigation expenses; and

d. Granting such other and further relief as the Court deems just and proper.

## COUNT V

*Conversion*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah and Jac Elan**

222.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein

223.     Under New Jersey law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights."

224.    At all relevant times, NAYA owned and had the legal right to control certain funds, inventory, customer payments, and other company assets that were entrusted to Defendant Dabah as its self-appointed and unilaterally assumed managing member.

225.     Pursuant to N.J.S.A. 42:2C-39, Dabah owed NAYA fiduciary duties, including the duty of loyalty to refrain from using company property for personal benefit or from dealing with the company's property as if it were his own.

226.     Despite this obligation, Dabah intentionally and without authority took possession of, diverted, and exercised control over NAYA funds and property, including but not limited to: (i) customer payments made to NAYA or Arena Stone; (ii) inventory and materials acquired by NAYA; (iii) NAYA funds used to pay for luxury personal expenses, including gift cards, travel, and merchandise; (iv) NAYA funds and assets used to complete projects for Jac Elan and Jac Elan Projects LLC; (v) NAYA funds used to purchase real estate that was titled in the names of third parties, including his wife, Elanit Dabah, and associate, Ithamar Aharanov.

227.    Defendant Elanit Dabah, the managing member of Jac Elan LLC and Jac Elan Projects LLC, knowingly received and retained the benefit of misappropriated NAYA property, including materials, customer relationships, and diverted revenues, all of which rightfully belonged to NAYA.

228.    Defendant Ithamar Aharanov also knowingly received and currently holds real property that was purchased, in whole or in part, using funds misappropriated from NAYA. The use of NAYA funds to acquire such property was unauthorized and done without the consent or knowledge of the other members of NAYA.

229.    Upon information and belief, both Elanit Dabah and Ithamar Aharanov allowed their names and entities to be used to conceal the true source of the funds and to obstruct NAYA's ability to recover its property.

230.    These actions constitute conversion under New Jersey law, as each Defendant exercised unlawful dominion and control over NAYA's personal property in a manner inconsistent with NAYA's ownership rights.

231.    The property converted includes both tangible assets (e.g., cash, stone materials, equipment) and intangible property (e.g., business goodwill, customer relationships, and exclusive distribution rights).

232.    As a direct and proximate result of Defendants' wrongful conversion, NAYA has sustained damages in excess of $9,600,000, and continues to suffer irreparable harm through the loss of assets, diversion of opportunities, and impairment of its business operations.

233.    All Defendants named in this Count are liable for the return or value of the converted property, and for any profits or benefits derived from the use or sale of such property

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a.  Declaring that Defendants unlawfully converted property rightfully belonging to NAYA;

b.  Ordering the return of all converted assets and property, or in the alternative, awarding Plaintiff the full fair market value of the converted property at the time of the conversion;

c.  Imposing a constructive trust on any and all property purchased or obtained through the use of misappropriated NAYA funds, including but not limited to real estate held in the names of Elanit Dabah and Ithamar Aharanov;

d.  Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $9,600,000;

e.  Awarding punitive damages due to the intentional, egregious, and malicious nature of Defendants' conduct;

f.  Awarding Plaintiff its costs of suit, including reasonable attorneys' fees, expert witness fees, and other related expenses; and

g.  Granting such other and further relief as the Court deems just and proper.

## COUNT VI

*Usurpation of a Corporate Opportunity and*
*Violation of the "Corporate Opportunity Doctrine"*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah**

234.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

235.    NAYA was formed for the express purpose of doing business in the stone business. NAYA was stepping into the shoes of Arena, by purchasing the business, so that it could continue Arena's business of selling stone and engaging in stone contracts including construction.

236.    Dabah was the self-appointed and unilaterally assumed controlling member of NAYA.

237.    Dabah owed express and implied duties to NAYA, including a duty of good-faith and fair dealing.

238.    At all times, NAYA had the ability to enter into construction contracts or relationships relating to stone and marble.

239.    As a member and self-appointed and unilaterally assumed managing member of NAYA, Defendant Dabah owed fiduciary duties of loyalty and care to NAYA, including the duty to refrain from diverting corporate opportunities for personal gain.

240.    The "corporate opportunity doctrine" prohibits officers, directors, and controlling members from exploiting for their own benefit business opportunities that belong to the corporation or that are closely related to its existing or prospective business.

241.    During his tenure with NAYA, and while acting as its self-appointed and unilaterally assumed manager, Dabah engaged in a scheme to divert valuable business opportunities and assets that rightfully belonged to NAYA to himself and/or entities he controlled, including Jac Elan LLC and Jac Elan Projects LLC.

242.    Specifically, Dabah usurped multiple commercial stone supply projects, including but not limited to, the "150 Main Street" Hackensack project and the Infinity Surfaces distribution relationship, by redirecting clients, leads, materials, and profits away from NAYA and toward his own entities.

243.    In doing so, Dabah intentionally misrepresented to clients and vendors that Jac Elan, and not NAYA, was the legitimate business entity with whom to contract, despite NAYA having acquired the assets and business operations of Arena Stone and having exclusive rights to distribute certain materials.

244.    Dabah further utilized NAYA's assets, including funds, personnel, client relationships, and inventory, to fulfill projects and transactions for his own entities, without disclosure to or consent from the other members of NAYA.

245.    These actions were taken while Dabah continued to assure the other members, particularly Dahan, that NAYA was not profitable and while simultaneously denying him access to financial information, bank accounts, and company records—actions which were clearly designed to conceal the ongoing usurpation.

246.    The opportunities diverted by Dabah were directly within the line of business of NAYA and constituted legitimate and substantial corporate opportunities that Dabah was obligated to present to NAYA.

247.    As a direct and proximate result of Dabah's wrongful appropriation of NAYA's corporate opportunities, NAYA has suffered damages in an amount to be determined at trial, but believed to be in excess of $9,600,000.

248.    Dabah's conduct constitutes a flagrant breach of his fiduciary duties and a textbook violation of the corporate opportunity doctrine, and warrants both compensatory and, where appropriate, punitive damages, as well as equitable relief including the imposition of a constructive trust over any proceeds or profits derived from the usurped opportunities

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a.  Declaring that Defendant Dabah breached his fiduciary duties and violated the corporate opportunity doctrine by diverting business opportunities, clients, and profits belonging to NAYA;

b.  Awarding compensatory damages to Plaintiff in an amount to be proven at trial, but not less than $9,600,000;

c.  Awarding punitive damages as permitted by law, based on the willful, wanton, and malicious nature of Defendant's conduct;

d.  Imposing a constructive trust over all profits, proceeds, assets, or interests obtained by Defendant as a result of the usurped corporate opportunities;

e.  Awarding Plaintiff the costs of suit, including reasonable attorneys' fees and expert fees; and

f.  Granting such other and further relief as the Court deems just and proper.

## COUNT VII

*Tortious Interference with Contract*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah and Jac Elan**

249.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

250.    At all relevant times, NAYA and/or Arena had valid and enforceable contractual relationships with multiple suppliers, clients, and vendors, including but not limited to: (i) exclusive distribution agreements such as the one with Infinity Surfaces, an Italian porcelain manufacturer; (ii) project-specific agreements with developers and builders such as the "150 Main Street" project in Hackensack, New Jersey; and (iii) general contracts with wholesale and retail clients and prospective purchasers.

251.    Defendant Dabah, while still a member of NAYA and its self-appointed and unilaterally assumed managing member, deliberately interfered with NAYA's existing and prospective contractual relationships for the benefit of himself and entities under his control, including Jac Elan LLC and Jac Elan Projects LLC.

252.    Dabah's interference included, but was not limited to: (i) diverting client leads and vendor relationships intended for NAYA to Jac Elan; (ii) using NAYA's confidential information, pricing models, and client relationships to solicit contracts for Jac Elan; (iii) causing NAYA employees to work on Jac Elan projects while being paid by NAYA; (iv) misleading clients into believing that Jac Elan, not NAYA, was the proper contractual party; (v) misappropriating inventory purchased by NAYA to fulfill obligations under third-party contracts with Jac Elan clients.

253.    By way of example, in connection with the "150 Main Street" project in Hackensack, New Jersey, valued at over $600,000 in potential profit, Dabah intentionally diverted

49

the business from NAYA to Jac Elan, despite Arena Stone (a NAYA-acquired business) having originated the lead and possessing the supplier relationship.

254.    These actions were taken without notice to, or approval by, NAYA or its other members, and were directly contrary to NAYA's interests.

255.    Under N.J.S.A. 42:2C-39, as a member of a New Jersey LLC, Dabah owed a duty of loyalty to NAYA not to compete with the company or take actions adverse to its business.

256.    Even assuming arguendo that Dabah had contractual authority to manage NAYA's affairs, New Jersey law recognizes that a company insider can be liable for tortious interference if acting outside the scope of his authority or in bad faith.

257.    Dabah's interference was willful, intentional, and without justification. His purpose was to benefit himself and his personally controlled companies by exploiting NAYA's opportunities and undermining NAYA's contracts.

258.    As a direct and proximate result of Dabah's tortious interference, NAYA lost substantial revenue, goodwill, and business relationships, and suffered other damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a. Declaring that Defendant tortiously interfered with NAYA's contractual and business relationships in violation of New Jersey common law;

b. Awarding Plaintiff compensatory damages in an amount to be proven at trial, including lost profits and lost business opportunities, believed to exceed $9,600,000;

c. Awarding punitive damages in light of Defendant's intentional, malicious, and bad faith conduct;

d.  Awarding Plaintiff the costs of suit, including reasonable attorneys' fees, expert fees, and related litigation expenses;

e.  Imposing equitable remedies, including a constructive trust over profits derived from diverted contracts or relationships; and

f.  Granting such other and further relief as the Court deems just and proper.

## COUNT VIII

*Tortious Interference with Economic Opportunity*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah and Jac Elan**

259.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

260.    NAYA had multiple ongoing and prospective business relationships and economic opportunities with clients, contractors, vendors, and suppliers, including—but not limited to—its exclusive distribution relationship with Infinity Surfaces and various large-scale commercial development projects such as "150 Main Street" in Hackensack, New Jersey.

261.    These opportunities were within NAYA's core line of business and were actively being developed or negotiated through its sales channels and long-standing industry relationships.

262.    Defendant Dabah, while acting as NAYA's self-appointed and unilaterally assumed managing member and fiduciary, was fully aware of NAYA's economic expectations and deliberately interfered with those opportunities to divert business, revenue, and goodwill for his own benefit and for the benefit of entities he controlled, including Jac Elan LLC and Jac Elan Projects LLC.

263.    By way of example, when Infinity Surfaces forwarded a lead to NAYA for a potential project in Washington, D.C., Dabah caused a Jac Elan employee to intercept and respond to the inquiry using NAYA's proprietary position as the exclusive distributor to solicit the client under Jac Elan's branding.

51

264.    Similarly, with respect to the "150 Main Street" project in Hackensack, New Jersey—valued at over $600,000 in potential profit—Dabah misrepresented NAYA's role and instead performed the project under Jac Elan, despite the fact that the opportunity originated from NAYA's prior relationship and standing as Arena Stone.

265.    In furtherance of his scheme, Dabah misappropriated NAYA's customer lists, vendor relationships, employee labor, and inventory, and reallocated those resources to support his own competing businesses.

266.    Under N.J.S.A. 42:2C-39, Dabah owed a duty of loyalty to NAYA as a member of a member-managed LLC, including the obligation to refrain from usurping corporate opportunities, misusing company assets, or competing with the company while still a member.

267.    Even if a member is authorized to act on behalf of the company, under New Jersey law a member may be held liable for tortious interference when acting in bad faith, with personal motivation, or outside the scope of legitimate company interests.

268.    Dabah's interference was knowing, intentional, and without legal justification. It was motivated by personal gain and executed in bad faith, using NAYA's own infrastructure and goodwill to compete against it.

269.    As a direct and proximate result of Defendant's tortious interference with NAYA's economic opportunities, NAYA suffered substantial damages including loss of contracts, lost revenue, damage to business reputation, and diminution in the value of the business.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a.  Declaring that Defendant tortiously interfered with NAYA's prospective economic relationships and business opportunities in violation of New Jersey law;

b.  Awarding Plaintiff compensatory damages in an amount to be determined at trial, including lost profits, diverted business, and reputational harm, believed to exceed $9,600,000;

c.  Awarding punitive damages for Defendant's intentional and bad-faith misconduct;

d.  Imposing a constructive trust over all proceeds or economic gains derived by Defendant from the usurped opportunities;

e.  Awarding Plaintiff its costs of suit, including reasonable attorneys' fees, expert fees, and other litigation expenses; and

f.  Granting such other and further relief as the Court deems just and proper.

## COUNT IX

*Civil Conspiracy*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah, Elanit Dabah and Ithamar Aharanov**

270.   Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein.

271.   At all relevant times, Defendant Dabah was a member and the self-appointed and unilaterally assumed managing member of NAYA, and owed fiduciary duties of loyalty, care, and good faith under N.J.S.A. 42:2C-39.

272.   Defendant Elanit Dabah, wife of Dabah and Managing Director of Jac Elan LLC and Jac Elan Projects LLC, knowingly participated in a scheme orchestrated by Dabah to divert and misappropriate NAYA funds and business opportunities for the benefit of entities and properties under her direct control.

273.   Defendant Ithamar Aharanov likewise participated in the conspiracy by knowingly accepting funds derived from NAYA's accounts and holding real property titled in his name that was purchased in whole or in part using misappropriated NAYA funds.

274.    Defendant Amnon Dabah likewise participated in the conspiracy by knowingly accepting funds derived from NAYA's accounts and holding real property titled in his name that was purchased in whole or in part using misappropriated NAYA funds.

275.    Defendant Yonatan Suliman-Zada likewise participated in the conspiracy by knowingly accepting funds derived from NAYA's accounts and holding real property titled in his name that was purchased in whole or in part using misappropriated NAYA funds.

276.    The Defendants, including Dabah, Elanit Dabah, Amnon Dabah, Yonatan Suliman-Zada and Ithamar Aharanov, entered into an agreement—either explicit or implied—to misappropriate and conceal NAYA assets through the diversion of projects, inventory, and payments and the laundering of funds into private real estate transactions.

277.    In furtherance of the conspiracy, Dabah routinely used NAYA funds to: (i) pay for personal expenses, travel, and luxury items; (ii) purchase or contribute to the purchase of real estate later titled in the names of Elanit Dabah and/or Ithamar Aharanov; (iii) divert stone materials and customers from NAYA to Jac Elan or Jac Elan Projects, entities managed or operated by Elanit Dabah; (iv) falsify internal records to conceal such misappropriations from NAYA's other members and stakeholders; and (v) funded a restaurant named La Sova as a way of hiding funds he stole from NAYA.

278.    Upon information and belief, Elanit Dabah, Amnon Dabah, Yonatan Suliman-Zada and Ithamar Aharanov knowingly allowed their names and entities to be used in these transactions to conceal the source of funds and to obstruct recovery by NAYA or its members.

279.    These actions were not isolated acts but part of a concerted, coordinated scheme involving the three Defendants to defraud NAYA and enrich themselves and their affiliated companies at the expense of NAYA's rightful stakeholders.

280.    The conspiracy caused NAYA substantial and continuing harm, including the loss of over $6 million in assets and economic opportunities, legal fees, and the devaluation of the company's goodwill and market position.

281.    Under New Jersey law, each conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy.

282.    Accordingly, all Defendants named in this Count are jointly and severally liable for the damages resulting from the civil conspiracy to defraud NAYA and misappropriate its funds.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a.  Declaring that Defendants engaged in a civil conspiracy to commit unlawful acts against NAYA, including fraud, breach of fiduciary duty, and conversion;

b.  Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $9,600,000;

c.  Awarding punitive damages for the willful, malicious, and egregious nature of the Defendants' conduct;

d.  Ordering the imposition of a constructive trust over any assets or property obtained or held by Defendants as a result of the conspiracy, including but not limited to any real estate purchased using NAYA funds;

e.  Awarding Plaintiff its costs of suit, including reasonable attorneys' fees, expert witness fees, and all other litigation-related expenses; and

f.  Granting such other and further relief as the Court deems just and proper.

## COUNT X

*Aiding and Abetting Breach of Fiduciary Duty*
(Under New Jersey Common Law and N.J.S.A. 42:2C-39)
**against Amihai Dabah and Elanit Dabah**

283.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if set forth fully herein

284.    At all times relevant, Dabah was a one-third member and the self-appointed and unilaterally assumed managing member of NAYA, and owed fiduciary duties to the company and its members, including duties of loyalty, care, good faith, and full disclosure pursuant to N.J.S.A. 42:2C-39.

285.    As set forth above, Dabah repeatedly breached those fiduciary duties by diverting millions of dollars of company funds, misappropriating customer relationships and assets, excluding co-members from company affairs, and using NAYA as a personal slush fund.

286.    Defendant Elanit Dabah, the wife of Dabah and the Managing Member of Jac Elan LLC and Jac Elan Projects LLC, knowingly aided and abetted Dabah's breaches of fiduciary duty.

287.    Elanit Dabah was integrally involved in the operations of Jac Elan and Jac Elan Projects — entities which directly benefitted from Dabah's misappropriation of NAYA's assets, projects, and materials.

288.    Upon information and belief, Elanit Dabah had knowledge that NAYA funds were being used improperly to purchase materials, pay vendors, and fulfill client orders for Jac Elan and its affiliates, rather than for the benefit of NAYA.

289.    Moreover, NAYA funds were used by Dabah to purchase or contribute to the purchase of real property that was then titled in Elanit Dabah's name, or in the name of entities she controlled, despite the fact that those funds belonged to NAYA and were never authorized to be used for personal investment.

290.    Elanit Dabah further participated in concealing the nature and extent of the misappropriation by failing to disclose the source of funds used in these transactions, despite her managerial role and control over the benefiting entities.

291.    By knowingly accepting and retaining misappropriated NAYA funds and using them to further her personal and corporate interests, Elanit Dabah substantially assisted in the breach of fiduciary duty by Dabah.

292.    Her conduct was knowing, intentional, and done with the purpose of enabling or benefitting from her husband's disloyalty and misuse of his position at NAYA.

293.    As a direct and proximate result of the aiding and abetting by Elanit Dabah, NAYA has suffered significant damages, including the loss of millions of dollars in diverted assets, lost profits, real estate opportunities, and business reputation.

294.    Under New Jersey law, a party who knowingly aids and abets a fiduciary in breaching their duty may be held jointly and severally liable for all damages arising from the breach.

**WHEREFORE**, Plaintiff NAYA respectfully requests that this Court enter judgment in its favor and against Defendant Dabah, Jac Elan, or any other entity or individual that improperly received a benefit at NAYA's detriment and grant the following relief:

a.  Declaring that Defendant knowingly aided and abetted Dabah's breaches of fiduciary duty in violation of New Jersey law;

b.  Awarding Plaintiff compensatory damages in an amount to be determined at trial, but believed to exceed $9,600,000;

c.  Imposing a constructive trust over any and all property obtained or held by Defendant that was acquired, in whole or in part, using NAYA funds, including real estate and assets held in her name or in the name of entities under her control;

d.  Awarding Plaintiff punitive damages based on the intentional and malicious nature of Defendant's conduct;

e.  Awarding Plaintiff costs of suit, including reasonable attorneys' fees, expert witness fees, and other related expenses; and

g.  Granting such other and further relief as the Court deems just and proper.

## **RESERVATION OF RIGHTS**

295.    Plaintiffs reserve the right to amend this Complaint to add or remove parties and causes of action to the extent necessary and in light of the information that becomes available, in accordance with the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure, Federal Rules of Civil Procedure, the local rules of this Court, or other applicable law. The filing of this Complaint does not constitute a waiver of any rights or claims available to the Plaintiffs.


Date:   August 7, 2025

*/s/ Daniel M. Stolz, Esq.*
**GENOVA BURNS, LLC**
Daniel M. Stolz, Esq.
Lauren W. Gershuny, Esq.
Jaclynn N. McDonnell, Esq.
*DStolz@genovaburns.com*
*LGershuny@genovaburns.com*
*Jmcdonnell@genovaburns.com*
110 Allen Rd., Suite 304
Basking Ridge, New Jersey 07920
(973) 230-2095
*Counsel to the Plaintiffs/Debtors*

**MICHAEL M. COHEN, ESQ.**
275 Walton Street
Englewood, New Jersey 07631
Phone: (201) 370-4826
MCohen@yourlitigationteam.com
*Special Litigation Counsel*